# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In Re 2025 UPMC Subpoena | Civil Action No. 2:25-mc-01069 A. et al |

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO QUASH SUBPOENA DUCES TECUM

Jill E. Steinberg* (PA 82127)
J. Chesley Burruss* (PA 331521)
Kevin M. Hayne* (NY 5967526)
Elizabeth A. Lilly* (PA 336185)
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
steinbergj@ballardspahr.com
burrussc@ballardspahr.com
haynek@ballardspahr.com
lillye@ballarspahr.com

Rachael L. Dizard (PA 315482)
Alison Gutierrez (PA 330738)
FOX ROTHSCHILD LLP
Six PPG Place
Suite 1000
Pittsburgh, PA 15222
RDizard@foxrothschild.com
agutierrez@foxrothschild.com

Mary M. McKenzie* (PA 47434)
Daniel Urevick-Ackelsberg* (PA 307758)
Meghan Binford* (PA 321212)
Olivia Mania* (PA 336161)
PUBLIC INTEREST LAW CENTER
2 Penn Center
1500 JFK Blvd., Suite 802
Philadelphia, PA 19102
267-546-1316
mmckenzie@pubintlaw.org
dackelsberg@pubintlaw.org
mbinford@pubintlaw.org
omania@pubintlaw.org

*Counsel for Movants*
*\*Pro hac vice forthcoming*

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND .............................................................................................................. 1

    I.    UPMC's Provision of Gender-Affirming Care to Pennsylvania Citizens................. 1

    II.   The DOJ Subpoena Seeks Access to Children's Confidential Mental and
         Reproductive Health Records and Threatens Potential Federal Prosecutions ........... 4

    III.  The Administration's other Attacks on the Rights of Transgender Americans ......... 8

    IV.  Movants Want Their Privileged Medical Records to Remain Private ...................... 9

LEGAL STANDARD......................................................................................................... 10

ARGUMENT ................................................................................................................... 11

    I.    Patients and Their Parents Have a Constitutional Right to Privacy in Their Medical
         Records ............................................................................................................. 11

    II.   Under *Westinghouse* the DOJ Subpoena Should be Quashed.................................. 12

    A.     Westinghouse Factors One, Two and Three ...................................................... 13

    B.     Westinghouse Factor Four ................................................................................ 14

    C.     Westinghouse Factor Five................................................................................. 15

    D.     Westinghouse Factors Six and Seven ............................................................... 17

    III.  The Subpoena was Issued for an Improper Purpose ................................................. 19

CONCLUSION................................................................................................................ 21

## TABLE OF AUTHORITIES

### Cases

*In re Admin. Subpoena No. 25-1431-019*,
  --- F.Supp.3d ---, No. 1:25-mc-91324-MJJ, 2025 WL 2607784 (D. Mass. Sep.
  9, 2025) ...............................................................................................................17, 18, 19

*Doe v. Delie*,
  257 F.3d 309 (3d Cir. 2001)........................................................................................12

*Doe v. Luzerne Cnty.*,
  660 F.3d 169 (3d Cir. 2011)........................................................................................12

*Doe v. Se. Pa. Transp. Auth. (SEPTA)*,
  72 F.3d 1133 (3d Cir. 1995)....................................................................................11, 12

*Doe v. Triangle Doughnuts, LLC*,
  No. 19-CV-5275, 2020 WL 3425150 (E.D. Pa. June 23, 2020)........................................15

*Doe v. Univ. of Scranton*,
  No. 3:19CV1486, 2020 WL 1244368 (M.D. Pa. Mar. 16, 2020)......................................15

*In re Grand Jury Matter*,
  770 F.2d 36 (3d Cir. 1985).........................................................................................10

*Greene v. Phila. Hous. Auth.*,
  789 F. Supp. 2d 582 (E.D. Pa. 2011) ...........................................................................10

*Murray v. Pittsburgh Bd. of Educ.*,
  759 F. Supp. 1178 (W.D. Pa. 1991)..............................................................................14

*Nw. Mem'l Hosp. v. Ashcroft*,
  362 F.3d 923 (7th Cir. 2004) ................................................................................14, 15

*Olmstead v. United States*,
  277 U.S. 438 (1928) (Brandeis, J., dissenting) .............................................................11

*Pleasant Gardens Realty Corp. v. H. Kohnstamm & Co.*,
  No. CIV. 08-5582JHRJS, 2009 WL 2982632 (D.N.J. Sept. 10, 2009) ..............................11

*In re Schering Plough Corp. Intron/Temodar Consumer Class Action*,
  678 F.3d 235 (3d Cir. 2012)....................................................................................17, 18

*In re Sealed Case (Admin. Subpoena)*,
  42 F.3d 1412 (D.C. Cir. 1994)................................................................................20, 21

*In re Search Warrant (Sealed)*,
    810 F.2d 67 (3d Cir. 1987)..........................................................................11, 12

*Sec. & Exch. Comm'n v. Wheeling-Pittsburgh Steel Corp.*,
    648 F.2d 118 (3d Cir. 1981)........................................................................19, 21

*Sterling v. Borough of Minersville*,
    232 F.3d 190 (3d Cir. 2000)..........................................................11, 12, 13, 19

*In Re: Subpoena No. 25-1431-014*,
    2:25-mc-00039 (E.D. Pa. July 8, 2025), Dkt. No. 1 ...................................... *passim*

*Travelers Indem. Co. v. Cephalon, Inc.*,
    32 F. Supp. 3d 538 (E.D. Pa. 2014) .....................................................................18

*United States v. Cortese*,
    614 F.2d 914 (3d Cir. 1980).................................................................................19

*United States v. Morton Salt Co.*,
    338 U.S. 632 (1950).............................................................................................10

*United States v. Powell*,
    379 U.S. 48 (1964)...............................................................................................19

*United States v. Westinghouse Elec. Corp.*,
    638 F.2d 570 (3d Cir. 1980).............................................................10, 11, 12, 13

*United States v. Westinghouse Elec. Corp.*,
    788 F.2d 164 (3d Cir. 1986).................................................................................10

*Whalen v. Roe*,
    429 U.S. 589 (1977).............................................................................................11

*Wm. T. Thompson Co. v. Gen. Nutrition Corp.*,
    671 F.2d 100 (3d Cir. 1982)...........................................................................10, 11

**Statutes**

5 U.S.C. § 552a .........................................................................................................17

18 U.S.C. § 3486........................................................................................................16, 17

**Other Authorities**

46 Pa.B. 2251..............................................................................................................3

*AMA Adopts New Policies on First Day of Voting at 2019 Annual Meeting*, AM.
    MED. ASS'N (June 10, 2019), https://www.ama-assn.org/press-center/ama-
    press-releases/ama-adopts-new-policies-first-day-voting-2019-annual-meeting ...................16

Andrew R. Flores *et al.*, *Gender Identity Disparities in Criminal Victimization: National Crime Victimization Survey, 2017-2018*, 111 AM. J. PUB. HEALTH 726 (2021), https://pmc.ncbi.nlm.nih.gov/articles/PMC7958056/pdf/AJPH.2020.306099.pdf ................................................................................................................16

*Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, THE WHITE HOUSE (January 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/defending-women-from-gender-ideology-extremism-and-restoring-biological-truth-to-the-federal-government/ ...................................................................................................8

*Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children*, OFF. OF PUB. AFFS., U.S. DEP'T OF JUST. (July 9, 2025), https://www.justice.gov/opa/pr/department-justice-subpoenas-doctors-and-clinics-involved-performing-transgender-medical ......................6, 19

*Ending Radical Indoctrination in K-12 Schooling*, THE WHITE HOUSE (Jan. 29, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/ending-radical-indoctrination-in-k-12-schooling/ ...................................................................9

*Gender and Sexual Development Program*, UPMC CHILD.'S HOSP. OF PITT., https://www.chp.edu/our-services/aya-medicine/gender-development [https://web.archive.org/web/20250115085822/https://www.chp.edu/our-services/aya-medicine/gender-development] (archived on Jan. 15, 2025) ...............................2

Gina M. Sequeira et al., *Transgender Youth's Disclosure of Gender Identity to Providers Outside of Specialized Gender Centers*, 66 J. OF ADOLESCENT HEALTH 691, 696 (2020), https://www.jahonline.org/action/showPdf?pii=S1054-139X%2819%2930931-0 ....................................................................................2, 15

*Initial Rescissions of Harmful Executive Orders and Actions*, THE WHITE HOUSE (Jan. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/initial-rescissions-of-harmful-executive-orders-and-actions/ .........................9

Julius Bourke & Simon Wessely, *Confidentiality*, 336 BMJ 888 (2008), https://pmc.ncbi.nlm.nih.gov/articles/PMC2323098/pdf/bmj-336-7649-prac-00888.pdf ...............................................................................................................13

Kiley Koscinski, *DOJ Subpoenas UPMC for Records on Gender-Affirming Care for Trans Youth*, 90.5 WESA (July 31, 2025), https://www.wesa.fm/health-science-tech/2025-07-31/doj-subpoena-upmc-records-gender-affirming-care-trans-youth. ...................................................................................................................15

*LGBTQIA+ Clinical Services*, UPMC, https://www.upmc.com/services/lgbtqia [https://web.archive.org/web/20250126022225/https://www.upmc.com/services/lgbtqia] (archived on Jan. 26, 2025) ................................................................2, 8

*March 26, 2021: State Advocacy Update*, AM. MED. ASS'N (Mar. 26, 2021), https://www.ama-assn.org/health-care-advocacy/advocacy-update/march-26-2021-state-advocacy-update ...........................................................................................3

Medical Assistance Bulletin No. 99-16-11, *Federal Final Rule, "Nondiscrimination in Health Programs and Activities" and Implication for Coverage of Services Related to Gender Transition*, PA. DEP'T HEALTH & HUM. SERVS. (July 18, 2016), https://www.pa.gov/content/dam/copapwp-pagov/en/dhs/documents/docs/publications/documents/forms-and-pubs-omap/c_233793.pdf ...........................................................................................3

*Medical Association Statements in Support of Health Care for Transgender People and Youth*, GLAAD (June 26, 2024), https://glaad.org/medical-association-statements-supporting-trans-youth-healthcare-and-against-discriminatory/ ...........................................................................................3

*National Child Abuse Prevention Month, 2025,* THE WHITE HOUSE (April 3, 2025), https://www.whitehouse.gov/presidential-actions/2025/04/national-child-abuse-prevention-month-2025/...............................................................5, 13, 19

*Our Mission, Vision, and Values*, UPMC, https://www.upmc.com/about/why-upmc/mission (last visited Sep. 17, 2025) ...............................................................2

*President Trump Promised to End Child Sexual Mutilation-and He Delivered*, THE WHITE HOUSE (July 25, 2025), https://www.whitehouse.gov/articles/2025/07/president-trump-promised-to-end-child-sexual-mutilation-and-he-delivered/...........................................................8

*Prioritizing Military Excellence and Readiness*, THE WHITE HOUSE (Jan. 27, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/prioritizing-military-excellence-and-readiness/ ...............................................................9, 19

*Protecting Children From Chemical and Surgical Mutilation*, THE WHITE HOUSE (Jan. 28, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/protecting-children-from-chemical-and-surgical-mutilation/ ........................4

U.S. OFF. OF THE ASSISTANT ATT'Y GEN., MEMORANDUM: CIVIL DIVISION ENFORCEMENT PRIORITIES (June 11, 2025), https://www.justice.gov/civil/media/1404046/dl?inline ......................................6, 18

U.S. OFF. OF THE ATT'Y GEN., MEMORANDUM FOR SELECT COMPONENT HEADS: PREVENTING THE MUTILATION OF AMERICAN CHILDREN (Apr. 22, 2025), https://www.justice.gov/ag/media/1402396/dl .....................................4, 5, 7, 16, 20

*Understanding Unapproved Use of Approved Drugs "Off Label"*, U.S. FOOD & DRUG ADMIN. (Feb. 5, 2018), https://www.fda.gov/patients/learn-about-expanded-access-and-other-treatment-options/understanding-unapproved-use-approved-drugs-label ...........................................................................................18

UPMC, https://www.upmc.com/ (last visited Sep. 13, 2025)............................................................1

## INTRODUCTION

For years parents have sought evidence-based gender-affirming care for their children from the University of Pittsburgh Medical Center ("UPMC"), a place where their families felt safe and confident in their care. But this summer the Department of Justice ("DOJ"), consistent with the overall policy objectives of the Trump Administration (the "Administration"), served a broad and sweeping subpoena on UPMC (the "Subpoena"), seeking years' worth of records of every patient under the age of nineteen who received gender-affirming care.

These medical records are the most intimate kind these young patients have, detailing their mental health, reproductive health, and sexual health. The government intrusion into their privacy therefore must be justified by compelling reasons. But the justification for this intrusion is clear: the Administration seeks to use the immense power of DOJ to threaten providers, intimidate families, and end gender-affirming care.

Gender-affirming care is legal in this Commonwealth and endorsed by every reputable medical association as a critical medical intervention. Accordingly, no justification exists for the Administration's egregious violation of UPMC patients' constitutional right to privacy in their personal medical records. The Subpoena should be quashed.

## BACKGROUND

### I. UPMC's Provision of Gender-Affirming Care to Pennsylvania Citizens

UPMC is a nonprofit healthcare provider headquartered in Pittsburgh, employing 5,000 physicians across hundreds of sites in the Commonwealth of Pennsylvania.[1] UPMC's self-described vision is "that every patient gets the right care, in the right way, at the right time, every

---

[1]    UPMC, https://www.upmc.com/ (last visited Sep. 13, 2025).

time," including a "safe environment," where all individuals are treated "with dignity and respect."[2]

As part of this foundational mission, UPMC, including the UPMC Children's Hospital of Pittsburgh, provided gender-affirming care to individuals under the age of nineteen through its Gender and Sexual Development Program, which brought "together care from all over UPMC Children's Hospital."[3] Such care included behavioral health care, resources for social transition, puberty-blocking medicine, and hormone therapy.[4] That care required patient medical evaluations in the most sensitive areas, including mental health, gender identity, sexuality, and reproductive health. And those providing this care at UPMC needed to build a high degree of trust with their young patients because a "sobering" amount of transgender youth fail to so much as disclose their gender identity to physicians, even when those patients believed it was important to do so.[5]

In addition, as UPMC physicians explained in a peer-reviewed study, transgender youth experience "significant health disparities and lower rates of health care utilization."[6] In fact,

---

[2]  *Our Mission, Vision, and Values*, UPMC, https://www.upmc.com/about/why-upmc/mission (last visited Sep. 17, 2025).

[3]  *LGBTQIA+ Clinical Services*, UPMC, https://www.upmc.com/services/lgbtqia [https://web.archive.org/web/20250126022225/https://www.upmc.com/services/lgbtqia] (archived on Jan. 26, 2025); *Gender and Sexual Development Program*, UPMC CHILD.'S HOSP. OF PITT., https://www.chp.edu/our-services/aya-medicine/gender-development [https://web.archive.org/web/20250115085822/https://www.chp.edu/our-services/aya-medicine/gender-development] (archived on Jan. 15, 2025); Kiley Koscinski, *DOJ Subpoenas UPMC for Records on Gender-Affirming Care for Trans Youth*, 90.5 WESA (July 31, 2025), https://www.wesa.fm/health-science-tech/2025-07-31/doj-subpoena-upmc-records-gender-affirming-care-trans-youth.

[4]  *LGBTQIA+ Clinical Services*, UPMC, https://www.upmc.com/services/lgbtqia [https://web.archive.org/web/20250126022225/https://www.upmc.com/services/lgbtqia] (archived on Jan. 26, 2025).

[5]  Gina M. Sequeira et al., *Transgender Youth's Disclosure of Gender Identity to Providers Outside of Specialized Gender Centers*, 66 J. OF ADOLESCENT HEALTH 691, 696 (2020), https://www.jahonline.org/action/showPdf?pii=S1054-139X%2819%2930931-0.

[6]  *Id.* at 692 (citation modified).

"[s]tudies suggest that improved body satisfaction and self-esteem following the receipt of gender-affirming care is protective against poorer mental health and supports healthy relationships with parents and peers."[7] Likewise, gender-affirming care is associated with "reductions in suicide attempts" and "decreased rates of depression and anxiety."[8] It is therefore not surprising that every major medical association and leading world health authority supports health care for transgender people and youth.[9]

Moreover, gender-affirming care is legal in this Commonwealth. In fact, the Pennsylvania Insurance Department advises insurers that to comply with Pennsylvania anti-discrimination law "it is anticipated that a[n insurance] policy will not exclude services based on gender identity and will not contain a categorical exclusion of coverage for all health services related to gender transition."[10] Medicare, as well as Pennsylvania's state Medicaid policy, explicitly cover gender-affirming care.[11]

---

[7] *March 26, 2021: State Advocacy Update*, AM. MED. ASS'N (Mar. 26, 2021), https://www.ama-assn.org/health-care-advocacy/advocacy-update/march-26-2021-state-advocacy-update.

[8] *Id.*

[9] *Medical Association Statements in Support of Health Care for Transgender People and Youth*, GLAAD (June 26, 2024), https://glaad.org/medical-association-statements-supporting-trans-youth-healthcare-and-against-discriminatory/ (collecting statements from the American Medical Association, American Psychiatric Association, American College of Physicians among others in support of the provision of gender-affirming care for transgender individuals).

[10] 46 Pa.B. 2251.

[11] Medical Assistance Bulletin No. 99-16-11, Federal Final Rule, "Nondiscrimination in Health Programs and Activities" and Implication for Coverage of Services Related to Gender Transition, PA. DEP'T HEALTH & HUM. SERVS. (July 18, 2016), https://www.pa.gov/content/dam/copapwp-pagov/en/dhs/documents/docs/publications/documents/forms-and-pubs-omap/c_233793.pdf.

II.      **The DOJ Subpoena Seeks Access to Children's Confidential Mental and
         Reproductive Health Records and Threatens Potential Federal Prosecutions**

On January 28, 2025, President Trump issued Executive Order 14187 entitled "Protecting

Children From Chemical and Surgical Mutilation."[12] The Order proclaimed that "[a]cross the

country today, medical professionals are maiming and sterilizing a growing number of

impressionable children under the radical and false claim that adults can change a child's sex

through a series of irreversible medical interventions."[13] The Order equated "gender affirming

care" with "chemical and surgical mutilation," directed the Attorney General to conduct

investigations related to such care, and made clear that the purpose was to "end" gender-affirming

care.[14]

Pursuant to Executive Order 14187, the Attorney General issued a Memorandum for Select

Component Heads, titled "Preventing the Mutilation of American Children."[15] The Memo declared

that "the Department [of Justice] will act decisively to protect our children and hold accountable

those who mutilate them under the guise of care" and directed "all U.S. Attorneys to investigate

all suspected cases of [female genital mutilation ("FGM")]—under the banner of so-called

'gender-affirming care' or otherwise—and to prosecute all FGM offenses to the fullest extent

possible."[16]

The Memo also directed DOJ "to undertake appropriate investigations of any violations of

the Food, Drug, and Cosmetic Act by manufacturers and distributors engaged in misbranding by

---

[12]  *Protecting Children From Chemical and Surgical Mutilation*, THE WHITE HOUSE (Jan. 28,
      2025),   https://www.whitehouse.gov/presidential-actions/2025/01/protecting-children-from-
      chemical-and-surgical-mutilation/.
[13]  *Id.*
[14]  *Id.*
[15]  U.S. OFF. OF THE ATT'Y GEN., MEMORANDUM FOR SELECT COMPONENT HEADS: PREVENTING
      THE   MUTILATION   OF   AMERICAN   CHILDREN   (Apr.   22,   2025),
      https://www.justice.gov/ag/media/1402396/dl.
[16]  *Id.* at 3–4.

making false claims about the on- or off-label use of puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called 'gender transition'" and "investigations under the False Claims Act of false claims submitted to federal health care programs for any noncovered services related to radical gender experimentation."[17]

The Memo clearly articulates the purpose of those investigations:

> Protecting America's children must be our top priority, whether from drug cartels, terrorists, or even our own medical community. Every day, we hear more harrowing stories about children who will suffer for the rest of their lives because of the unconscionable ideology behind "gender-affirming care." Under my leadership, the Department of Justice will *bring these practices to an end*.[18]

The Memo also announced that DOJ would "partner with state attorneys general to identify leads, share intelligence, and build cases against hospitals and practitioners violating federal or state laws banning female genital mutilation and other, related practices."[19]

In addition to casting gender-affirming care as "mutilation," the Administration began equating gender-affirming care to child abuse. In April, the Administration issued a Proclamation in connection with National Child Abuse Prevention Month stating that "the sinister threat of gender ideology" is "one of the most prevalent forms of child abuse facing our country today," specifically calling out "hormone therapy [and] puberty blockers."[20] The Administration "pledge[d] to stop the atrocity of child abuse in all its forms" and "affirm[ed] that every perpetrator who inflicts violence on our children will be punished to the fullest extent of the law."[21]

---

[17]  *Id.* at 4.
[18]  *Id.* at 6 (emphasis added).
[19]  *Id.* at 5.
[20]  *National Child Abuse Prevention Month, 2025*, THE WHITE HOUSE (April 3, 2025), https://www.whitehouse.gov/presidential-actions/2025/04/national-child-abuse-prevention-month-2025/.
[21]  *Id.*

In June, the Assistant Attorney General of the Civil Division wrote that the Civil Division will use "all available resources to prioritize investigations of doctors, hospitals, pharmaceutical companies, and other appropriate entities" providing gender-affirming care through the Food, Drug, and Cosmetic Act ("FDCA") and the False Claims Act.[22] On the same day, DOJ took action, issuing "more than 20 subpoenas to doctors and clinics involved in performing transgender medical procedures on children."[23] Again, the Administration's intent was clear, with the Attorney General stating that "[m]edical professionals and organizations that mutilated children in the service of a warped ideology will be held accountable by this Department of Justice."[24]

UPMC was among the clinics subpoenaed by DOJ.[25] While the Subpoena has never been released, it is—upon information and belief—identical or substantially similar to the subpoenas issued to Children's Hospital of Philadelphia and Boston Children's Hospital.[26] The Subpoena requests a staggering amount of sensitive patient information, including:

---

[22] U.S. OFF. OF THE ASSISTANT ATT'Y GEN., MEMORANDUM: CIVIL DIVISION ENFORCEMENT PRIORITIES 2-3 (June 11, 2025), https://www.justice.gov/civil/media/1404046/dl?inline.

[23] *Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children*, OFF. OF PUB. AFFS., U.S. DEP'T OF JUST. (July 9, 2025), https://www.justice.gov/opa/pr/department-justice-subpoenas-doctors-and-clinics-involved-performing-transgender-medical.

[24] *Id.*

[25] Jessica Riley, *UPMC Among Clinics Subpoenaed by Department of Justice Over Gender-Affirming Care*, CBS NEWS (July 31, 2025), https://www.cbsnews.com/pittsburgh/news/upmc-gender-affirming-care-subpoena/.

[26] *See In Re: Subpoena No. 25-1431-014*, 2:25-mc-00039 (E.D. Pa. July 8, 2025), Dkt. No. 1; *In Re: Administrative Subpoena No. 25-1431-019*, 1:25-mc-91324 (D. Mass. July 8, 2025), Dkt. No. 5-1; Kiley Koscinski, *DOJ Subpoenas UPMC for Records on Gender-Affirming Care for Trans Youth*, 90.5 WESA (July 31, 2025), https://www.wesa.fm/health-science-tech/2025-07-31/doj-subpoena-upmc-records-gender-affirming-care-trans-youth ("[R]ecords to be preserved . . . include patient records and identities, diagnoses, informed consent documents and parent or guardian authorization, disclosure of risks, adverse events and side effects as well as disclosures about off-label use of medications. UPMC has also instructed staff to preserve billing records, coding practices and insurance claims."). A copy of the subpoena served on Children's Hospital is attached hereto as Exhibit E.

- Request 11: "Documents sufficient to identify each patient (by name, date of birth, social security number, address, and parent/guardian information) who was prescribed puberty blockers or hormone therapy."

- Request 12: "For each such patient identified in Subpoena [Request 11], documents relating to the clinical indications, diagnoses, or assessments that formed the basis for prescribing puberty blockers or hormone therapy."

- Request 13: "All documents relating to informed consent, patient intake, and parent or guardian authorization for minor patients identified in [Request 11], including any disclosures about off-label use (i.e., uses not approved by the United States Food and Drug Administration) and potential risks."[27]

The "Relevant Time Period" for documents to be produced pursuant to the Subpoena is January 1, 2020, through the present.[28]

Neither DOJ nor UPMC has sought the consent of any family with regards to the Subpoena nor otherwise communicated with them about it. In other words, for a population of children that UPMC physicians have already identified as lacking trust in the medical system, DOJ now seeks unfettered access to everything from their social security numbers and addresses to the intimate details they told their health care providers about their state of mind, their sexual orientation and gender identity, and the course of treatment they chose with their physician and parents. And DOJ has stated that it will not just scrutinize that information but that it may share that information with others.[29]

---

[27] *In Re: Subpoena No. 25-1431-014*, 2:25-mc-00039 (E.D. Pa. July 8, 2025), Dkt. No. 1 at 40–41.

[28] *Id.* at 36.

[29] U.S. Off. of the Att'y Gen., Memorandum for Select Component Heads: Preventing the Mutilation of American Children 5 (Apr. 22, 2025), https://www.justice.gov/ag/media/1402396/dl ("I will partner with state attorneys general to identify leads, share intelligence, and build cases.").

As a result of these threats, UPMC ended its gender-affirming care for patients under nineteen years old on June 30, 2025.[30] It did not do so because of any new law or regulation nor because of a change in medical standards or guidance. It did so *only* because the Administration has "made it abundantly clear that [its] clinicians can no longer provide certain types of gender-affirming care without risk of criminal prosecution."[31] Hospitals around the nation followed suit.[32] Meanwhile, UPMC continues to provide gender-affirming care to patients nineteen years of age and older.[33]

### III.    The Administration's other Attacks on the Rights of Transgender Americans

This Subpoena is one piece of the Administration's coordinated effort to delegitimize the concept of gender identity and eliminate access to gender-affirming care for youth. This targeted campaign began on Inauguration Day, when the Administration issued Executive Order 14168 titled "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," stating "[i]t is the policy of the United States to recognize two sexes, male and female. These sexes are not changeable and are grounded in fundamental and incontrovertible reality."[34]

---

[30]    Kiley Koscinski, *DOJ Subpoenas UPMC for Records on Gender-Affirming Care for Trans Youth*, 90.5 WESA (July 31, 2025), https://www.wesa.fm/health-science-tech/2025-07-31/doj-subpoena-upmc-records-gender-affirming-care-trans-youth.

[31]    *Id.*

[32]    *President Trump Promised to End Child Sexual Mutilation—and He Delivered*, THE WHITE HOUSE (July 25, 2025), https://www.whitehouse.gov/articles/2025/07/president-trump-promised-to-end-child-sexual-mutilation-and-he-delivered/.

[33]    *LGBTQIA+ Clinical Services at UPMC: Expert and Inclusive Care*, UPMC, https://www.upmc.com/services/lgbtqia (last visited Sep. 17, 2025).

[34]    *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, THE WHITE HOUSE (January 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/defending-women-from-gender-ideology-extremism-and-restoring-biological-truth-to-the-federal-government/.

The President subsequently issued related Executive Orders including banning transgender people from participating in the military[35] and withholding federal funds from schools "promoting gender ideology."[36] The Administration also repealed a number of prior executive orders that extended a variety of protections to transgender people.[37] The language of these orders attack the integrity of transgender people, including by stating they are not capable of living an "honorable, truthful, and disciplined lifestyle."[38] These orders make clear that the Administration is intent on targeting and delegitimizing transgender people in many facets of their lives, including their healthcare.

## IV.    Movants Want Their Privileged Medical Records to Remain Private

Movants are patients and former patients of UPMC who disclosed to their medical providers the most intimate details of their young lives, along with their parents.[39] These are details so deeply personal that no redaction can keep Movants anonymous and protect their privacy.[40] The medical records at issue include information about their homes, schooling, peers, mental health, reproductive health, gender identity, sexuality, treatment by others, and more.[41] Movants sought

---

[35] *Prioritizing Military Excellence and Readiness*, THE WHITE HOUSE (Jan. 27, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/prioritizing-military-excellence-and-readiness/.

[36] *Ending Radical Indoctrination in K-12 Schooling*, THE WHITE HOUSE (Jan. 29, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/ending-radical-indoctrination-in-k-12-schooling/.

[37] *Initial Rescissions of Harmful Executive Orders and Actions*, THE WHITE HOUSE (Jan. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/initial-rescissions-of-harmful-executive-orders-and-actions/.

[38] *Prioritizing Military Excellence and Readiness*, THE WHITE HOUSE (Jan. 27, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/prioritizing-military-excellence-and-readiness/.

[39] *See* Decl. of Parent A.A., Ex. A; Decl. of Parents B.B. 1 & B.B. 2, Ex. B; Decl. of Parent C.C., Ex. C; Joint Decl. of Parent and Child D.D., Ex. D (collectively, "Movant Decls.").

[40] Movant Decls. ¶¶ 11–12.

[41] Movant Decls. ¶ 3.

this care with the understanding that the private and sensitive information shared would remain between their family and their healthcare providers.[42] Yet DOJ now seeks highly personal medical records all while labeling the puberty blockers or hormone therapy that Movants here received[43] as "mutilation" and child abuse.

## LEGAL STANDARD

Generally, "[c]ourts will enforce a subpoena if (1) the subpoena is within the statutory authority of the agency; (2) the information sought is reasonably relevant to the inquiry; and (3) the demand is not unreasonably broad or burdensome." *United States v. Westinghouse Elec. Corp.*, 788 F.2d 164, 166 (3d Cir. 1986) [hereinafter *Westinghouse II*]; *see also United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950). Layered on top of that procedural checklist are substantive protections. Notably, DOJ's need for information must be balanced against an individual's constitutionally protected right to privacy. *See United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, 576 (3d Cir. 1980) [hereinafter *Westinghouse I*]. Moreover, if "a subpoena is issued for an improper purpose, such as harassment" it cannot be enforced, because to do so "constitutes an abuse of the court's process." *Westinghouse II*, 788 F.2d at 166–67.

A third party "has standing to move to quash" a subpoena that seeks their privileged information. *Greene v. Phila. Hous. Auth.*, 789 F. Supp. 2d 582, 586 (E.D. Pa. 2011); *see also In re Grand Jury Matter*, 770 F.2d 36, 38 (3d Cir. 1985) ("[A]n individual or entity claiming a property right or privilege in the subpoenaed documents has standing to contest the denial of a motion to quash the subpoena."); *Wm. T. Thompson Co. v. Gen. Nutrition Corp.*, 671 F.2d 100, 103 (3d Cir. 1982) ("When a claim of property or privilege is made with respect to a third party

---

[42]  Movant Decls. ¶ 13.
[43]  Movant Decls. ¶ 7. Filed contemporaneously with this motion is a motion to proceed under a pseudonym.

subpoena our cases are clear that the party claiming the property right or privilege may appeal."). The government itself has used this procedure. *Pleasant Gardens Realty Corp. v. H. Kohnstamm & Co.*, No. CIV. 08-5582JHRJS, 2009 WL 2982632, at *2 (D.N.J. Sep. 10, 2009) (allowing the United States, as a third party, to challenge "subpoenas directed to its former employees because [a party] is seeking to discover official information that belongs to the United States, some of which may be privileged or otherwise protected from discovery.") (citation modified).

## ARGUMENT

### I.    Patients and Their Parents Have a Constitutional Right to Privacy in Their Medical Records

The Constitution provides what Justice Brandeis described as "the most comprehensive of rights and the right most valued by civilized men"—"the right to be let alone." *Olmstead v. United States*, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting). This "right not to have intimate facts concerning one's life disclosed without one's consent is a venerable one whose constitutional significance [the Third Circuit has] recognized." *Sterling v. Borough of Minersville*, 232 F.3d 190, 195 (3d Cir. 2000) (citation modified). The constitutional right to privacy includes "the individual interest in avoiding disclosure of personal matters." *Whalen v. Roe*, 429 U.S. 589, 599 (1977).

In litigation in the Eastern District of Pennsylvania involving the presumptively identical subpoena, DOJ conceded that it "does not quibble with the sensitivity of the patient information involved in this subpoena." *In Re: Subpoena No. 25-1431-014*, 2:25-mc-00039 (E.D. Pa. July 8, 2025), Dkt. No. 13 at 11. Nor could it, as the Third Circuit has made plain that "[t]here can be no question that . . . medical records, which may contain intimate facts of a personal nature, are well within the ambit of materials entitled to privacy protection." *Westinghouse I*, 638 F.2d at 577; *see also In re Search Warrant (Sealed)*, 810 F.2d 67, 71 (3d Cir. 1987) ("medical records are clearly

within this constitutionally protected sphere"); *Doe v. Se. Pa. Transp. Auth. (SEPTA)*, 72 F.3d 1133, 1138 (3d Cir. 1995) (prescription records covered). So are matters regarding one's sexual identity, *see Sterling* 232 F.3d at 196, and matters which carry "stigma, potential for harassment, and 'risk of much harm from non-consensual dissemination of the information.'" *Doe v. Delie*, 257 F.3d 309, 315 (3d Cir. 2001) (quoting *Doe v. SEPTA*, 72 F.3d at 1140). In other words, the records and information sought are "precisely the sort intended to be protected by" the Constitution. *Doe v. SEPTA*, 72 F.3d at 1138.

## II.    Under *Westinghouse* the DOJ Subpoena Should be Quashed

Once a party establishes that a government subpoena intrudes into constitutionally-protected private matters, this Court must determine that "the societal interest in disclosure outweighs the privacy interest on the specific facts of the case." *Westinghouse I*, 638 F.2d at 578. To weigh these competing interests, courts must consider (1) "the type of record requested," (2) "the information it does or might contain," (3) "the potential for harm in any subsequent nonconsensual disclosure," (4) "the injury from disclosure to the relationship in which the record was generated," (5) "the adequacy of safeguards to prevent unauthorized disclosure," (6) "the degree of need for access," and (7) "whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access." *Id.*

Moreover, while the Third Circuit describes the typical *Westinghouse* balancing as a form of intermediate scrutiny, *see Doe v. SEPTA*, 72 F.3d at 1139–40, "[t]he more intimate or personal the information, the more reasonable the expectation is that it will remain confidential." *Doe v. Luzerne Cnty.*, 660 F.3d 169, 175 (3d Cir. 2011). Thus, where DOJ seeks to access one's highly personal and intimate information it must demonstrate it has a "genuine, legitimate and

12

compelling" interest in such access. *Sterling*, 232 F.3d at 196. Here, DOJ does not meet intermediate scrutiny, let alone the Third Circuit's more rigorous requirement.

        *A.* Westinghouse *Factors One, Two and Three*

Westinghouse Factors one, two and three consider the type of record requested, the information it does or might contain, and the potential for harm in any subsequent disclosure. All weigh strongly in favor of quashing the Subpoena as it relates to patient records. While medical records alone receive constitutional protection, the specific records at issue and their contents warrant even greater protection than that afforded to records of routine medical care. *See Westinghouse I*, 638 F.2d at 579, 577 (noting that seeking information "of a more personal nature" than routine x-rays would require even more protection).

Here, the Subpoena seeks a breathtaking array of sensitive information. That is, it requests to uncover the identity of minor patients and their parents—information DOJ demanded yet concedes in the related litigation in the Eastern District it does not currently need[44]—while also baselessly describing the treatment records it seeks as "mutilation" and child abuse.[45] That alone weighs strongly against disclosure.

But beyond seeking to discover families' identities, DOJ also seeks unfettered access to any information in the medical files of children that led to their diagnoses and course of treatment. This will generally include details regarding a child's mental health, gender identity, sexual health, fertility, along with many other personal details that relate to a child's relationship with their own

---

[44] *See In Re: Subpoena No. 25-1431-014*, 2:25-mc-00039 (E.D. Pa. July 8, 2025), Dkt. No. 13 at 11 ("[T]he government is willing to work with CHOP to minimize the impact on vulnerable patients, such as by accepting anonymized records as a first pass with the potential for obtaining more information on specific records should the need arise." (emphasis added)).

[45] *National Child Abuse Prevention Month, 2025,* THE WHITE HOUSE (April 3, 2025), https://www.whitehouse.gov/presidential-actions/2025/04/national-child-abuse-prevention-month-2025/.

body, their relationships in school, their parents' occupation, their neighborhood, and the names of their family members and friends. In practice, this means that any anonymization of these records would be insufficient and ineffective because the volume and detail in those records would inevitably point to a particular child and their family. *See Nw. Mem'l Hosp. v. Ashcroft*, 362 F.3d 923, 929 (7th Cir. 2004) (holding that redaction of medical records would not be sufficient to protect patients' privacy interests). Moreover, the information sought is so deeply personal that "[e]ven if there were no possibility that a patient's identity might be learned from a redacted medical record, there would be an invasion of privacy." *Id.*

The records and their contents, therefore, are worthy of the utmost protection as their disclosure poses the risk of serious harm. *See Murray v. Pittsburgh Bd. of Educ.*, 759 F. Supp. 1178, 1182 (W.D. Pa. 1991) (harm stemming from the "embarrassment and disclosure of sensitive personal information" is "an exceptionally serious matter"). This reality is perhaps why DOJ has already agreed in related litigation that the "subpoena requests sensitive health information about children, gender, and sexuality (factor 1), the records do in fact likely contain sensitive information (factor 2), and—because the information is sensitive—disclosures could cause embarrassment or harm (factor 3)." *In Re: Subpoena No. 25-1431-014*, 2:25-mc-00039 (E.D. Pa. July 8, 2025), Dkt. No. 13 at 9–10.

### B.  Westinghouse Factor Four

Factor four, the injury from disclosure to the relationship in which the record was generated, also weighs in favor of quashing the Subpoena as to patient records. The records the Subpoena demands are a product of the crucial relationships between healthcare providers and their patients. Confidentiality is a touchstone of these relationships, because it "preserves individual dignity, prevents information misuse, and protects autonomous decision making by the

patient."[46] Disclosure of the medical records the Subpoena requests would breach, and irreparably harm the sanctity of that relationship. *See Nw. Mem'l Hosp.*, 362 F.3d at 929 ("If Northwestern Memorial Hospital cannot shield the medical records of its . . . patients from disclosure in judicial proceedings, . . . the hospital will lose the confidence of its patients, and persons with sensitive medical conditions may be inclined to turn elsewhere for medical treatment."). Any such undermining of confidentiality risks destroying patients' trust in their healthcare providers and "might prevent people from seeking help when needed."[47] As UPMC physicians have explained, this risk is ever greater for transgender patients.[48]

### C. Westinghouse Factor Five

Courts must also consider how likely the information is to be subject to unauthorized disclosure. This is especially important here, where unauthorized disclosure presents catastrophic risk due to "the widespread discrimination, harassment, and violence faced by [transgender] individuals." *Doe v. Triangle Doughnuts, LLC*, No. 19-CV-5275, 2020 WL 3425150, at *4 (E.D. Pa. June 23, 2020); *see also Doe v. Univ. of Scranton*, No. 3:19CV1486, 2020 WL 1244368, at *2 (M.D. Pa. Mar. 16, 2020) ("the court is well-aware of the threat of violence that the LGBTQ community can face").

For example, in 2019, the American Medical Association recognized an "epidemic of violence against the transgender community" and noted that "[a]ccording to available tracking,

---

[46] Julius Bourke & Simon Wessely, *Confidentiality*, 336 BMJ 888, 888 (2008), https://pmc.ncbi.nlm.nih.gov/articles/PMC2323098/pdf/bmj-336-7649-prac-00888.pdf.

[47] *Id.*

[48] Gina M. Sequeira et al., *Transgender Youth's Disclosure of Gender Identity to Providers Outside of Specialized Gender Centers*, 66 J. OF ADOLESCENT HEALTH 691, 696 (2020), https://www.jahonline.org/action/showPdf?pii=S1054-139X%2819%2930931-0.

fatal anti-transgender violence in the U.S. is on the rise."[49] Transgender people face much higher rates of violence, and households with at least one transgender member face higher rates of property victimization.[50] Because of the heightened risk of violence that transgender people face, there is a serious risk of harm to the patients and their families if their identities are disclosed to the general public, which would only be compounded by the disclosure of medical records and intimate personal details. *See* Movant Decls. ¶ 8–9. That risk is exacerbated by the fact that the Administration has branded their children's medical care as child abuse.

Despite these risks, there are no true statutory safeguards for how DOJ could use the information sought by the Subpoena, or who it may share it with. While 18 U.S.C. § 3486(e) places a general limitation on use of the information sought by the Subpoena such that DOJ may not use or disclose it in "any administrative, civil, or criminal action or investigation directed against the individual who is the subject of the information," that limitation is extremely narrow and thus mitigates very little with respect to fears of disclosure. It merely prohibits the Administration from using the information against the patients themselves and can be overcome with a court order. *See* 18 U.S.C. § 3486(e)(1).

Moreover, DOJ announced its intention to "partner with state attorneys general to *identify leads*, *share intelligence*, and build cases against hospitals and practitioners."[51] Since there is no explicit prohibition on the sharing of information accessed through a subpoena permitted by 18

---

[49] *AMA Adopts New Policies on First Day of Voting at 2019 Annual Meeting*, AM. MED. ASS'N (June 10, 2019), https://www.ama-assn.org/press-center/ama-press-releases/ama-adopts-new-policies-first-day-voting-2019-annual-meeting.

[50] Andrew R. Flores et al., *Gender Identity Disparities in Criminal Victimization: National Crime Victimization Survey, 2017–2018*, 111 Am. J. Pub. Health 726, 727 (2021), https://pmc.ncbi.nlm.nih.gov/articles/PMC7958056/pdf/AJPH.2020.306099.pdf.

[51] U.S. OFF. OF THE ATT'Y GEN., MEMORANDUM FOR SELECT COMPONENT HEADS: PREVENTING THE MUTILATION OF AMERICAN CHILDREN 5 (Apr. 22, 2025), https://www.justice.gov/ag/media/1402396/dl (emphasis added).

U.S.C. § 3486, identifying leads and sharing intelligence may mean providing patient information and data to state law enforcement officials. *See* 18 U.S.C. § 3486(e)(1); 5 U.S.C. § 552a(b)(7) (Privacy Act provision permitting disclosure to state law enforcement officials). Such information sharing is particularly terrifying to any parent who sought medically-approved and legal care for their child, especially now that the Administration is characterizing this care as child abuse.

> ### D.  Westinghouse *Factors Six and Seven*

*Westinghouse* factors six, the degree of need for access, and seven, whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access, do not outweigh factors one through five.

To begin, DOJ cannot articulate a need for comprehensive medical records for every patient who received either puberty blockers or hormone therapy during the Relevant Time Period, which includes the last five years. In fact, as part of litigation related to the presumptively identical subpoena issued to the Children's Hospital of Philadelphia, the Department could not identify a particular need for patient and parent information, instead making general assertions that "the acts being investigated here are, at base, statutory violations commonly investigated by the Government in many contexts over many decades" and that "[t]he document requests here are common in such investigations." *In Re: Subpoena No. 25-1431-014*, 2:25-mc-00039 (E.D. Pa. July 8, 2025), Dkt. No. 13 at 7. Yet DOJ offered no facts even suggesting that these statutory violations are happening at UPMC.

For example, DOJ purports that it may be investigating whether an entity violated the FDCA by prescribing medications for "off-label use." While "[t]he FDCA . . . generally prohibits manufacturers from marketing, advertising, or otherwise promoting drugs for . . . unapproved or 'off label' uses," it "does not regulate the practice of medicine, [and] physicians may lawfully

prescribe drugs for off-label uses." *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 240 (3d Cir. 2012) (internal citations omitted).[52] This is known to DOJ, which states that any alleged violation of the FDCA for "off-label use" is limited to the *promotion* of such use by pharmaceutical companies or "dealers such as online pharmacies."[53]

* * *

DOJ has statutory authority to investigate health care offenses and may subpoena records in pursuit of legitimate investigations of those offenses. However, the simultaneous subpoenas lodged against twenty medical institutions for fifteen categories of documents that are hugely broad and seek highly sensitive documents represent a barely disguised political agenda in search of a health care fraud offense. And DOJ has yet to articulate anything to the contrary. In sum, DOJ is seeking to "use its subpoena power to go on a fishing expedition" through "an astonishingly broad array of documents and information that are virtually unlimited in scope." *In re Admin. Subpoena No. 25-1431-019*, --- F. Supp. 3d ---, No. 1:25-mc-91324-MJJ, 2025 WL 2607784, at *6 (D. Mass. Sep. 9, 2025) (quashing presumptively same subpoena to Boston Children's Hospital). Factors six and seven, in other words, favor quashing the Subpoena rather than enforcing it.

* * *

---

[52] *See also Travelers Indem. Co. v. Cephalon, Inc.*, 32 F. Supp. 3d 538, 544 (E.D. Pa. 2014) ("[B]ecause the FDCA does not regulate the practice of medicine, and because prescription drugs may have therapeutic uses other than their FDA-approved indications, physicians may lawfully prescribe drugs for off-label use." (internal citation omitted); *Understanding Unapproved Use of Approved Drugs "Off Label"*, U.S. FOOD & DRUG ADMIN. (Feb. 5, 2018), https://www.fda.gov/patients/learn-about-expanded-access-and-other-treatment-options/understanding-unapproved-use-approved-drugs-label ("From the FDA perspective, once the FDA approves a drug, healthcare providers generally may prescribe the drug for an unapproved use when they judge that it is medically appropriate for their patient.").

[53] U.S. OFF. OF THE ASSISTANT ATT'Y GEN., MEMORANDUM: CIVIL DIVISION ENFORCEMENT PRIORITIES 3 (June 11, 2025), https://www.justice.gov/civil/media/1404046/dl?inline.

DOJ seeks to invade a deeply personal, constitutionally protected sphere. To do so it must offer "genuine, legitimate and compelling" interest in such access. *Sterling*, 232 F.3d at 196. It fails to do so, and the Subpoena should be quashed.

## III.    The Subpoena was Issued for an Improper Purpose

The Subpoena should be quashed for another independent reason: its issuance was motivated by bad faith. While, generally speaking, courts will enforce an administrative subpoena if it seeks information reasonably relevant to an inquiry within its statutory authority, a court should not enforce a subpoena "issued for an improper purpose, such as to harass" the recipient or "to put pressure on him to settle a collateral dispute." *United States v. Powell,* 379 U.S. 48, 58 (1964). This "heavy burden," *United States v. Cortese*, 614 F.2d 914, 919 (3d Cir. 1980), can also be met by demonstrating an agency "is knowingly pursuing frivolous allegations in bad faith" or is "motivated by . . . animus." *Sec. & Exch. Comm'n v. Wheeling-Pittsburgh Steel Corp.*, 648 F.2d 118, 129 (3d Cir. 1981).

Here a court need not read subtext, because animus is official policy. The Administration has asserted that transgender citizens cannot lead an "honorable, truthful, and disciplined lifestyle,"[54] and that their medical treatment is part of a "warped ideology" and "evil and backwards lies" that cause "sexual mutilation."[55] *See also* Background Section III, *supra*. As a result of that animus, the Administration has taken numerous actions with the goal of putting an

---

[54]    *Prioritizing Military Excellence and Readiness*, THE WHITE HOUSE (Jan. 27, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/prioritizing-military-excellence-and-readiness/.

[55]    *National Child Abuse Prevention Month, 2025,* THE WHITE HOUSE (April 3, 2025), https://www.whitehouse.gov/presidential-actions/2025/04/national-child-abuse-prevention-month-2025/; *Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children*, OFF. OF PUB. AFFS., U.S. DEP'T OF JUST. (July 9, 2025), https://www.justice.gov/opa/pr/department-justice-subpoenas-doctors-and-clinics-involved-performing-transgender-medical.

"end" to gender-affirming care by seeking to "investigate and hold accountable medical providers and pharmaceutical companies" who have provided gender-affirming care.[56]

The only court to publicly rule on a presumptively identical subpoena has already found it was issued in bad faith. *See In re Admin. Subpoena No. 25-1431-019*, 2025 WL 2607784. There the court considered the "astonishingly broad[,] virtually unlimited . . . scope" of the subpoena, and held that it "was issued for an improper purpose, motivated only by bad faith," *Id.* at *6–7. The requests went beyond what was legally permitted because "the Government cannot broadly make inquiry into the provision of [gender-affirming care] generally—any such inquiry must be limited to healthcare fraud that is authorized by the statute: fraudulent billing codes and unlawful off-label promotion." *Id.* In concluding that there was no proper purpose for the subpoena, the court explained that "the Administration has been explicit about its disapproval of the transgender community and its aim to end [gender-affirming care]," and "the true purpose of issuing the subpoena is to interfere with the Commonwealth['s] right to protect [gender-affirming care] within its borders, to harass and intimidate [the hospital] to stop providing such care, and to dissuade patients from seeking such care." *Id.* at *7.

The same is true here. As discussed above, the requests go beyond what would be necessary for DOJ to investigate alleged violations of the FDCA insofar as the Subpoena seeks the identities and full medical records of patients who received puberty blockers or hormone therapy, and a plethora of intimate personal information contained therein. If DOJ wishes, for example, to investigate the promotion of the off-label use of particular drugs, it can request marketing materials. It need not identify patients and their parents by name, nor rifle through their most

---

[56] U.S. OFF. OF THE ATT'Y GEN., MEMORANDUM FOR SELECT COMPONENT HEADS: PREVENTING THE MUTILATION OF AMERICAN CHILDREN 4 (Apr. 22, 2025), https://www.justice.gov/ag/media/1402396/dl.

intimate thoughts and feelings in hopes of finding something nefarious. *See, e.g.*, *In re Sealed Case (Admin. Subpoena)*, 42 F.3d 1412, 1418 (D.C. Cir. 1994) (administrative subpoena does not give issuer "unfettered authority to cast about for potential wrongdoing").

DOJ has not set forth a legitimate enforcement purpose for the Subpoena. Gender-affirming care remains legal in the Commonwealth of Pennsylvania. And UPMC provides its patients care in accordance with all applicable federal and state laws. Any allegation or conclusions otherwise are clear pretext for animus-based attempts to end gender-affirming care. *See In re Administrative Subpoena No. 25-1431-019*, 2025 WL 2607784, at *7. The Subpoena was therefore issued in bad faith and without any proper purpose, *Wheeling-Pittsburgh Steel Corp.*, 648 F.2d at 129, and its sweeping requests for the medical records and personal information of patients and their parents should be quashed.

## CONCLUSION

Movants respectfully request that this Court quash those parts of the Subpoena that seek production of the identities or health information of patients and their parents.

Dated: September 24, 2025

By: /s/ Jill Steinberg
Jill Steinberg* (PA 82127)
J. Chesley Burruss* (PA 331521)
Kevin M. Hayne* (NY 5967526)
Elizabeth A. Lilly* (PA 336185)
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
215-665-8500
steinbergj@ballardspahr.com
burrussc@ballardspahr.com
haynek@ballardspahr.com
lillye@ballarspahr.com

By: /s/ Alison Gutierrez
Rachael L. Dizard (PA 315482)
Alison Gutierrez (PA 330738)
FOX ROTHSCHILD LLP
Six PPG Place
Suite 1000
Pittsburgh, PA 15222
RDizard@foxrothschild.com
agutierrez@foxrothschild.com

Respectfully submitted,

By: /s/ Mary M. McKenzie
Mary M. McKenzie* (PA 47434)
Daniel Urevick-Ackelsberg* (PA 307758)
Meghan Binford* (PA 321212)
Olivia Mania* (PA 336161)
PUBLIC INTEREST LAW CENTER
2 Penn Center
1500 JFK Blvd., Suite 802
Philadelphia, PA 19102
267-546-1316
mmckenzie@pubintlaw.org
dackelsberg@pubintlaw.org
mbinford@pubintlaw.org
omania@pubintlaw.org

*Counsel for Movants*
*\*Pro hac vice forthcoming*