# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| In Re 2025 UPMC Subpoena | Civil Action No. 2:25-mc-01069-CB |

## MOVANTS' MEMORANDUM OF LAW IN COMPLIANCE
## WITH THIS COURT'S DECEMBER 24TH ORDER

**BALLARD SPAHR LLP**

Michael P. Robotti* (NY 4718532)
1675 Broadway, 19th Floor
New York, NY 10019
212-223-0200
robottim@ballardspahr.com

J. Chesley Burruss* (PA 331521)
Kevin M. Hayne* (NY 5967526)
Elizabeth A. Lilly* (PA 336185)
1735 Market Street, 51st Floor
Philadelphia, PA 19103
burrussc@ballardspahr.com
haynek@ballardspahr.com
lillye@ballarspahr.com

**FLANNERY GEORGALIS**

Colin J. Callahan (PA 328033)
436 Seventh Avenue
Koppers Building, Ste. 2100
Pittsburgh, PA 15219
412-213-4246
ccallahan@flannerygeorgalis.com

**PUBLIC INTEREST LAW CENTER**

Mary M. McKenzie* (PA 47434)
Daniel Urevick-Ackelsberg* (PA 307758)
Meghan Binford* (PA 321212)
Olivia Mania* (PA 336161)
2 Penn Center
1500 JFK Blvd., Suite 802
Philadelphia, PA 19102
267-546-1316
mmckenzie@pubintlaw.org
dackelsberg@pubintlaw.org
mbinford@pubintlaw.org
omania@pubintlaw.org

*Counsel for Movants*
*\*Pro hace vice*

## <u>TABLE OF CONTENTS</u>

**Page**

BACKGROUND AND PATIENTS' POSITION ........................................................................ 2

ARGUMENT .............................................................................................................................. 2

    I.     A concession from the Department of Justice does not grant it statutory
          authority that it does not have ............................................................................... 3

          A.     DOJ's willingness to accept less information does not make the
                subpoena more relevant ............................................................................ 3

          B.     The federal government's improper attempt to regulate the practice
                of medicine is not altered by its alleged concession ................................ 5

    II.    The *Westinghouse* factors continue to require quashing the demands .................. 7

          A.     The records DOJ demands cannot be anonymized .................................... 8

          B.     Even were anonymization possible, DOJ's invasion of privacy
                remains .................................................................................................... 12

          C.     DOJ has already failed to make even a threshold showing that it
                needs these records ................................................................................. 14

    CONCLUSION ................................................................................................................ 16

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re 2025 UPMC Subpoena*,
   No. 2:25-MC-01069-CB, 2025 WL 3724705 (W.D. Pa. Dec. 24, 2025) ...................... *passim*

*In re Admin. Subp. No. 25-1431-019*,
   800 F. Supp. 3d 229 (D. Mass. 2025) ...........................................................................4, 5, 15

*Alpha Medical Clinic v. Anderson*,
   128 P.3d 364 (Kan. 2006) ...........................................................................................13, 15

*Doe v. Luzerne Cnty.*,
   660 F.3d 169 (3d Cir. 2011)................................................................................................12

*Doe v. Triangle Doughnuts, LLC*,
   No. 19-CV-5275, 2020 WL 3425150 (E.D. Pa. June 23, 2020)..........................................14

*In re: DOJ Admin. Subpoena No. 25-1431-030*,
   No. 25-MC-00063-SKC-CYC, 2026 WL 33398 (D. Colo. Jan. 5, 2026) ........................3, 4, 6

*In Re: 2025 Subpoena to Child.'s Nat'l Hosp.*, No. 1:25-cv-03780 (D. Md. 2025)......................4

*Lora v. Bd. of Ed. of City of New York*,
   (E.D.N.Y. 1977)...................................................................................................................13

*In re NHL Players' Concussion Injury Litig.*,
   120 F. Supp. 3d 942 (D. Minn. 2015) ...................................................................................7

*Nw. Mem'l Hosp. v. Ashcroft*,
   362 F.3d 923 ...........................................................................................10, 11, 13, 14

*Pa. Med. Soc'y v. Marconis*,
   942 F.2d 842 (3d Cir. 1991)................................................................................................6

*Parkson v. Central DuPage Hosp.*,
   435 N.E.2d 140 (Ct. App. Ill. 1982) ...................................................................................11

*QueerDoc, PLLC v. U.S. Dep't of Just.*,
   No. 2:25-MC-00042-JNW, 2025 WL 3013568 (W.D. Wash. Oct. 27, 2025)..........................4

*Robinson v. Magovern*,
   83 F.R.D. 79 (W.D. Pa. 1979) .............................................................................................12

*Rural Hous. All. v. U.S. Dept. of Agric.*,
   498 F.2d 73 (D.C. Cir. 1974) ..............................................................................................11

*In re Subpoena Duces Tecum No. 25-1431-016*,
  No. 2:25-MC-00041-JHC, 2025 WL 3562151 (W.D. Wash. Sept. 3, 2025) .......................4, 5

*In re Subpoena No. 25-1431-014*,
  No. MC 25-39, 2025 WL 3252648 (E.D. Pa. Nov. 21, 2025) ........................................ *passim*

*United States v. Guzman-De Los Santos*,
  944 F. Supp. 2d 126 ...............................................................................................9

*United States v. McGovern*,
  87 F.R.D. 584 (M.D. Pa. 1980) ...............................................................................9

*United States v. Westinghouse Electric Corp.*,
  638 F.2d 570 (3d Cir. 1980) ..............................................................8, 12, 13, 15

*Wipf v. Altstiel*,
  888 N.W.2d 790 (S. D., 2016) ...............................................................................11

**Regulations**

45 C.F.R. § 164.502 ......................................................................................................11

45 C.F.R. § 164.514 ......................................................................................................11

The Department of Justice's ("DOJ") attempt to use healthcare fraud subpoenas to end gender-affirming care has been met with uniform rebuke. Six different courts, including this one, have concluded that the most intimate details of a child's life have no relevance to any investigation Congress authorized DOJ to undertake.

DOJ, which recently said it will accept "anonymized" records, apparently intends to take another bite at the apple in its simultaneously filed brief—even for those requests this Court already quashed. While nothing about this Court's ruling requires this sort of reexamination, the result is the same. The documents deemed irrelevant would not *increase* in relevance if they were to contain *even less* information. DOJ's willingness to accept redacted records does not transform the fundamentally improper purpose of this investigation into a proper one. This Court and others have already determined that DOJ's true purpose is to use raw federal power to regulate the state practice of medicine. That purpose has not somehow changed, simply because DOJ is now willing to have some of the information it demands obscured.

Moreover, DOJ's eleventh-hour concession is an illusion. A redaction pen is not a magic wand. The medical records DOJ demands are so enmeshed with the details of children's lives— from their siblings, hobbies, and pets, to their physical appearances, struggles with eating disorders, parents' professions, and special education status—that anonymization is functionally impossible. And all this comes as DOJ continues to swear to other courts, including on the same day as this alleged concession, that the information it concedes it does not need here remains critical to the same investigation elsewhere.

In other words, DOJ's last-gasp bid to access the medical records of children does not "moot" their privacy interests nor "change[] the legal landscape." Dkt. No. 47 at 2. Its doublespeak makes plain that the subpoena requests should remain quashed.

## BACKGROUND AND PATIENTS' POSITION

On December 24, 2025, this Court granted the motion of current and former minor patients ("Patients") to quash requests 11 through 13 of the subpoena at issue, because DOJ's demands exceeded its authority and invaded the right to privacy of minor patients seeking gender-affirming care at the University of Pittsburgh Medical Center ("UPMC"). *In re 2025 UPMC Subpoena*, No. 2:25-MC-01069-CB, 2025 WL 3724705 (W.D. Pa. Dec. 24, 2025) ("*UPMC*"). The Court declined to rule on Patients' motion to quash patient information in other parts of the subpoena, and granted DOJ's request to brief the impact of its concession that it will settle for receiving allegedly anonymized data. *Id.* at *3.

Patients understand the Court's Order to permit only briefing on DOJ's concession with regards to those parts of the subpoena that remain outstanding—requests 1 through 10, 14, and 15. This significantly narrows the issue: the remaining requests have vastly less personal patient information, and traditional redaction procedures can likely resolve the controversy.

The meet and confer process the parties engaged in prior to filing the instant brief revealed that DOJ's interpretation of this Court's order differs, with DOJ positing that the Court granted it latitude to argue that UPMC must comply with even requests 11 through 13, be it through a modification of this Court's holding or some other mechanism. Accordingly, in an abundance of caution, particularly given this Court's simultaneous briefing schedule, Patients explain below why, even if the Court were to entertain argument as to those requests, DOJ's concession in no way alters this Court's decision to quash the demands.

## ARGUMENT

In quashing DOJ's demands for the intimate medical records of children, this Court incorporated the decision of the Eastern District of Pennsylvania regarding an identical subpoena served to Children's Hospital of Philadelphia ("CHOP"), which "dismantle[d] *all* of the

government's arguments." *UPMC*, 2025 WL 3724705, at *1 (citing *In re Subpoena No. 25-1431-014*, No. MC 25-39, 2025 WL 3252648, at *11 (E.D. Pa. Nov. 21, 2025) ("*CHOP* ")).

*CHOP* "is not an outlier." *Id.* Rather, "several courts have ruled on similar subpoenas sent to providers of gender-related care around the country. No reported federal decision has ruled in the government's favor." *In re: DOJ Admin. Subpoena No. 25-1431-030*, No. 25-MC-00063-SKC-CYC, 2026 WL 33398, at *3 (D. Colo. Jan. 5, 2026) ("*Colorado Children's*") (recommendation of Magistrate Judge) (cleaned up). Nor should this Court. The government's late offer of redaction does not suddenly render its subpoena proper, nor does it protect the Patients' heightened right to privacy.

## I.    A concession from the Department of Justice does not grant it statutory authority that it does not have

### A.    DOJ's willingness to accept less information does not make the subpoena more relevant

In *CHOP*, the court explained the foundational question regarding the legality of DOJ's demands:

> This inquiry leads us back to the first principles and to the authority vested by the Framers in our elected persons representing us in Congress. The authority to issue administrative subpoenas is not inherent in the Executive Branch—it is a delegation from Congress. **Congress permitted the Department of Justice, through Section 3486, to issue subpoenas only to investigate a "federal health care offense" and only to seek "records or other things relevant to the investigation" of such an offense**. The scope of this power extends only as far as Congress allows. **And Congress ties the authority directly to relevance**—the Department of Justice may not use a federal court subpoena to demand specific records if they are not relevant to a federal health care offense.

2025 WL 3252648, at *11 (emphasis added).

That court, along with this one, answered the foundational question—are the records relevant?—with a clear "no": the "three requests seek information which bear no relevance to the investigation Congress permitted or to the investigation the Department of Justice tells the world it is pursuing under the Act." *Id.* at *12. The court noted all the ways DOJ made this clear,

explaining that DOJ's explanation was "not credible," employed "wayward reasoning" that "makes it difficult to identify a consistent statutory basis or investigative target within the limits Congress imposed," *id.* at *16, "blurs . . . fundamental distinctions," "has no cognizable bounds," "defies both law and logic" and "conflicts with (and does not cure) the premise underlying" DOJ's sworn declarations, *id.* at *18. Put simply, "Requests 11 through 13 fail the relevance test." *Colorado Children's*, 2026 WL 33398, at *5. Every court to consider the issue has held the same.[1]

Faced with mounting authority ruling against it, DOJ's pivot makes sense. But it is disingenuous. First, this Court's noted skepticism about the timing of the alleged concession, *UPMC*, 2025 WL 3724705 at *3, is well-founded: on the very same day it advised UPMC that it would accept allegedly anonymized data, it swore to the District Court of Maryland (as it did to this Court in October)[2] that the very same "patient records, including patient identities" were needed to "provide essential investigative leads" and to identify "witnesses," without which DOJ "cannot fully determine the scope of the violations" it alleged it was investigating. *See In Re: 2025 Subpoena to Child.'s Nat'l Hosp.*, No. 1:25-cv-03780 (D. Md. 2025), Dkt. No. 15-1, ¶ 40.

---

[1] *See also QueerDoc, PLLC v. U.S. Dep't of Just.*, No. 2:25-MC-00042-JNW, 2025 WL 3013568, at *6 (W.D. Wash. Oct. 27, 2025) (requests 11 through 13 "have little to do with investigating violations of FDCA or FCA"); *In re Admin. Subp. No. 25-1431-019*, 800 F. Supp. 3d 229, 239 (D. Mass. 2025) ("*Boston Children's*") (holding subpoena "compris[es] overbroad requests for documents and information seemingly unrelated to investigating fraud or unlawful off-label promotion."); *In re Subpoena Duces Tecum No. 25-1431-016*, No. 2:25-MC-00041-JHC, 2025 WL 3562151, at *8 (W.D. Wash. Sept. 3, 2025) ("*Seattle Children's*") ("The DOJ does not make a prima facie showing that its subpoena is authorized by Congress because it does not establish that it has a realistic expectation of discovering something relevant to the investigation of a federal healthcare offense.").

[2] Dkt. No. 27-1, Hsaio Decl. 14 ¶ 38.

Second, and beyond this unexplained inconsistency, any argument that alleged anonymization cures the government's ills is also illogical. Every court known to consider the matter has found that DOJ is missing a nexus between the information it seeks and the statute it invokes: because "the subpoena authority granted by Congress does not reach lawful off-label prescribing or internal clinical documentation . . . the patient-specific materials in Requests 11, 12 and 13 cannot be relevant to investigating a Section 331 'federal health care offense.'" *CHOP*, 2025 WL 3252648, at *19.

It is for this reason that DOJ's attempt to relitigate this Court's decision makes little sense. Taking a redaction pen to irrelevant records would not make them relevant. A demand for truly anonymized records might be less blatantly offensive, but "[a]dministrative subpoenas . . . must remain tethered to lawful authority and reasonable relevance, lest the investigatory process itself become the abuse Congress forbids." *Id.* at *14. The concession does not create such a tether. Rather, it only makes clear how abusive the demand was all along. Standing alone, the Court's conclusion that the records are entirely irrelevant is sufficient to reject DOJ's request that UPMC produce redacted versions of the irrelevant records in response to requests 11 through 13.

**B.    The federal government's improper attempt to regulate the practice of medicine is not altered by its alleged concession**

If this Court were to proceed further in its analysis, there is another independent reason for rejecting DOJ's second bite at the apple. The redaction of documents similarly does nothing to change the improper purpose of DOJ's investigation. Rather, "the Administration has been explicit about its disapproval of the transgender community and its aim to end [gender-affirming care]. The subpoena reflects those goals," *Boston Children's*, 800 F. Supp. 3d 229, 239, particularly "to pressure hospitals into ending gender-related care for minors," *Seattle Children's*, 2025 WL 3562151, at *11. That might be a permissible policy goal of the current

administration, but "Congress, through Section 3486, does not authorize a federal investigation into lawful medical practice simply because the President or current Attorney General disapproves of the care" that children receive. *CHOP*, 2025 WL 3252648, at *17; *accord Colorado Children's*, 2026 WL 33398, at *10 ("Congress has granted no authority to use administrative subpoenas to investigate gender-affirming care, let alone to attempt to end such care through the use of such subpoenas.").

Lest there be any doubt, the government continues to "say the quiet parts out loud." *UPMC*, 2025 WL 3724705, at *2. For example, at a press conference on December 18, 2025, the Deputy Secretary of Health and Human Services ("HHS") proclaimed that, "[a]t the root of the evils we face, such as the blurring of the lines between sexes and radical social agendas, is a hatred for nature as God designed it and for life as it was meant to be lived. This ideology does not just deny biology, it declares war against it." PBS NewsHour, *Trump administration seeks to cut off access to transgender health care for U.S. children*, at 36:52 (YouTube, Dec.18, 2025), https://www.youtube.com/watch?v=_TQeKC87geU.[3]

Nor would redaction alter the government's attempt to run roughshod over basic principles of federalism, where "sovereign authority to oversee the medical profession in the Commonwealth [is] guaranteed under the Tenth Amendment," *CHOP*, 2025 WL 3252648, at *19, and "the licensing and regulation of physicians is a state function," *Pa. Med. Soc'y v. Marconis*, 942 F.2d 842, 847 (3d Cir. 1991). This subpoena seeks to turn that constitutional design upside down, allowing the federal government to "trample[] the Commonwealth of Pennsylvania's power to police, and legislate, matters of medical care." *UPMC*, 2025 WL

---

[3] This was not a stray comment, but rather one justification for the declaration from HHS Secretary Robert F. Kennedy Jr. that DOJ submitted days later as "supplemental authority" in this matter. *See* Dkt. Nos. 49, 51.

3724705, at *2; *accord CHOP*, 2025 WL 3252648, at *17. The vague proposal by DOJ does not alter that violation.

A redaction pen has its limits. DOJ exceeded its authority by using a healthcare fraud dragnet to request irrelevant information in an attempt to end gender-affirming care for children. Its last-minute concession does not change that. For this reason alone, requests 11 through 13 should remain quashed.

## II.    The *Westinghouse* factors continue to require quashing the demands

Even if this Court were to proceed beyond the clear evidence that requests 11 through 13 seek irrelevant records and that DOJ issued the subpoena for an improper purpose, there is a third independent reason those requests must remain quashed. DOJ's suggestion that "anonymized records" moot the Patients' privacy interests mischaracterizes the nature of the records and reveals DOJ's fundamental misunderstanding of the privacy interests at issue. The undisputed record evidence in this case shows that the medical records in question go far beyond a generic x-ray or name that can be redacted. Rather, they contain the most intimate details of the Patients' lives. It is functionally impossible to protect the Patients' constitutional privacy interests through redactions.[4]

---

[4] Patients, who quashed the subpoena that targeted their records, plainly maintain a continued interest in the enforcement of that decision. The very case DOJ cites for its mootness proposition in its Motion to Allow Supplemental Briefing demonstrates that even the discoverability of de-identified, truly anonymized, less sensitive medical information subject to a protective order is ripe for court consideration on privacy grounds. *See In re NHL Players' Concussion Injury Litig.*, 120 F. Supp. 3d 942 (D. Minn. 2015) (recognizing that "players' medical information is highly confidential" but balancing players' privacy interests against the fact that the requested data was "highly relevant in [the] litigation" to allow discovery of "medical information [that] can be adequately anonymized and protected"). Parties that won a motion to quash or that are subject to a protective order, plainly have a continued interest in that order.

But even were anonymization possible, there is a fourth and final independent reason for keeping those requests quashed. Specifically, DOJ's concession does not alter this Court's balancing of the factors in *United States v. Westinghouse Electric Corp.*, which permit disclosure only to the extent "that the societal interest in disclosure outweighs the privacy interest on the specific facts of the case." 638 F.2d 570, 578 (3d Cir. 1980). Those factors continue to "overwhelmingly weigh in favor of protecting the privacy interests of the Hospital's child patients given the Department of Justice's stated purpose" of its investigation. *CHOP*, 2025 WL 3252648, at *8.

### A.    The records DOJ demands cannot be anonymized

The records presumably responsive to requests 11, 12, and 13 cannot be anonymized. Indeed, the unique nature of these records—and DOJ's attempted intrusion—is critical for understanding why DOJ's vague proposal for redaction is insufficient. Neither DOJ nor UPMC has submitted any evidence to this Court as to what information is actually contained in the UPMC records that DOJ seeks in requests 11 through 13. But Patients have, and that record evidence is undisputed.

At the start of this litigation, Patients explained: "Our privacy would not be protected by redacting our names" because "[d]uring the course of my child's care, we disclosed innumerable sensitive, identifiable facts to UPMC medical providers," including "information about my child's relationships in school, parents' occupation, neighborhood, family and friends, and more." Dkt. No. 2, Exs. A–C ¶ 11; *id.*, Ex. D ¶ 11 (same as to Child D.D.). Providers, facing the same intrusion, have noted the same. *See* Memo. in Supp. of Mot. to Limit, *CHOP* (E.D. Pa. July 8, 2025), Dkt. No. 1 at 13 n.6 ("Given the nature of the records, redacting the names of patients or using pseudonyms would not mitigate the privacy concerns. The details included in patient files would indicate, for example, the patient's location, the occupation of their parents, ages of

their siblings, etc. Armed with those details, it would be far too easy to uncover a patient's identity.").[5]

This detail exists because, as confirmed in the attached declaration, health care providers begin treatment at UPMC's Gender and Sexual Development Program with a lengthy assessment of the minor patient, complete with intimate details of their personal life including, among other things, mental health, sexual activity, friendships, relationships with family, and school and work life. Ex. A, Decl. of Colleen M. Krajewski, M.D. ("Krajewski Decl.") ¶¶ 6, 9-10. Topics covered include anxiety, depression, obsessive thoughts, disordered eating, incidents of trauma, and suicidal ideation. *Id.* ¶ 18. Health care providers also ask about a patient's sexual history, use of contraception, substance use and/or abuse, and feelings on fertility. *Id.* ¶ 19.

Providers follow up on these topics at every appointment, thus creating a paper trail "rife with material about the innermost thoughts and feelings about [patients'] bodies, sexuality, peer relations, and family dynamics." *Id.* ¶ 20. Patients explained this, too: "Even if it were possible to completely remove all identifying facts from the records, our privacy would not be protected because during the course of my child's care we disclosed deeply sensitive, intimate, and private

---

[5] Rather than address that issue, DOJ took a different approach, arguing (as it continues to argue elsewhere) that unmasked patient data is essential to its investigation. Thus, while Patients again explain that anonymization is impossible, the issue is undisputed and waived. *United States v. Guzman-De Los Santos*, 944 F. Supp. 2d 126, 128 (defendant's failure to respond to the government's argument in a motion to quash "waives these arguments"). Accordingly, any representation from UPMC that it does not know what is in the documents seven months after receiving the subpoena is as irrelevant as its "trust us" Proposed Order is specious. DOJ's litigation choices are its own, but those choices should not be used to once again place the rights of children in legal limbo. To the extent not waived, and if there is any subsequent factual dispute about what information is contained in those records or the inability of redaction to sufficiently anonymize them, Patients intend to seek an evidentiary hearing where they will call appropriate witnesses from UPMC to testify before this Court. *United States v. McGovern*, 87 F.R.D. 584, 585 (M.D. Pa. 1980) (discussing evidentiary hearing on petitioner's motion to enforce a subpoena).

facts about our lives including about mental health, gender identity, sexual health, and fertility."
Dkt. No. 2, Exs. A–C ¶ 12; *id.*, Ex. D ¶ 12 (same as to Child D.D.).

Along with a patient's innermost feelings, the records include additional personal
information such as physical descriptions (*e.g.*, weight, height, facial and body hair, and pubertal
development), medical conditions, medical procedures, medications, and treatment by other
medical and/or mental health providers. Krajewski Decl. ¶ 5. The records also include
information linking patients to families and communities, like names and physical descriptions
of close family (*e.g.*, parents, siblings, and extended family), pets, school names, grade level,
previous schools, enrollment in special education programs, extracurricular activities (including
details on games, recitals, and/or performances), hobbies, and volunteer work. *Id.* at ¶¶ 6, 8, 10.
Moreover, in the course of treatment, physicians sometimes capture names and other identifying
information about classmates, teammates, or neighbors, religious affiliation, membership in
community groups, parents' employment, and sibling dynamics. *Id.* at ¶¶ 9–10. Taken together,
this information provides a veritable roadmap for ascertaining a minor's identity. *See id.* ¶¶ 11,
21.

It follows that, even if UPMC were to redact names, dates of birth, and addresses, the
records would still contain a wealth of information that could be pieced together to identify a
particular individual. In practice, this means that "skillful 'Googlers' sifting the information
contained in the medical records concerning each patient's medical and sex history, will put two
and two together, 'out' the" children "and thereby expose them to threats, humiliation, and
obloquy." *Nw. Mem'l Hosp. v. Ashcroft*, 362 F.3d 923, 929. Concern about the ease with which
armchair detectives (let alone law enforcement itself) can easily uncover an individual's identity
has resulted in several courts finding that redactions may be insufficient to prevent identification,

even where the records contained much less extensive identifying information than is present here. *See id.*; *Parkson v. Central DuPage Hosp.*, 435 N.E.2d 140, 144 (Ct. App. Ill. 1982) (denying request for production of admit and discharge records because they "arguably contain histories of the patients' prior and present medical conditions, information that in the cumulative can make the possibility of recognition very high"); *Rural Hous. All. v. U.S. Dept. of Agric.*, 498 F.2d 73, 78 (D.C. Cir. 1974) (remanding to the district court to consider "whether the deletions thus far ordered are sufficient to protect the privacy of the individuals" and to consider "alternative sources of information which might be available" that are more relevant and do not infringe on privacy interests).[6] And the threat is compounded here, where the small number of children that identify as transgender further heightens the chance of identification. *See Wipf v. Altstiel*, 888 N.W.2d 790 (S.D., 2016) (reasoning that the small population at issue increased the chance of identification even where names, addresses, phone numbers, dates of birth, and social security numbers were redacted from medical records); Krajewski Decl. ¶¶ 4, 8 (risk of identification is "particularly true given the relatively small percentage of the population that identify as transgender," especially for patients from less-populated areas of Western Pennsylvania). In short, DOJ's concession does not change that the records it demands cannot functionally be anonymized.

---

[6] While not dispositive in a dispute regarding a constitutional invasion of privacy, the Health Insurance Portability and Accountability Act ("HIPAA") regulations recognize redaction is insufficient for certain types of medical records containing highly sensitive personal details, like those at issue here. While the regulations note that "de-identified" health records are not considered to be protected health information, 45 C.F.R. § 164.502, and set forth a list of identifiers that should be removed for "de-identification" purposes, *id.* § 164.514(b)(2), the regulations also decline to find such redaction sufficient when the recipient of a request has "knowledge that information could be used alone or in combination with other information to identify an individual who is a subject of the information," *id.* § 164.514(b)(2)(ii).

**B.      Even were anonymization possible, DOJ's invasion of privacy remains**

The Third Circuit's "governing principle is straightforward: 'the more intimate or personal the information, the more reasonable the expectation is that it will remain confidential.'" *CHOP*, 2025 WL 3252648 at *25 (quoting *Doe v. Luzerne Cnty.*, 660 F.3d 169, 175 (3d Cir. 2011)). In *Westinghouse*, for example, a federal agency sought to enforce a subpoena seeking medical records of a company's employees in furtherance of the agency's investigation. 638 F.2d at 573. Although the Third Circuit affirmed the district court's grant of the federal agency's petition to enforce the subpoena, it remanded the case to determine a procedure for protecting "information of a more personal nature," holding "more intimate data" should not be disclosed in the same manner as "5,000 x-rays." *Id.* at 582.

Although courts examining typical confidentiality disputes often find redaction and protective orders an appropriate solution for certain requests, s*ee, e.g.*, *CHOP*, 2025 WL 3252648, at *29 (noting the common use of a "protective order, sealing, or a written agreement"); *Robinson v. Magovern*, 83 F.R.D. 79, 92 (W.D. Pa. 1979) (finding confidentiality order sufficient where intrusion is minimal), the records here "are not x-rays," *CHOP*, 2025 WL 3252648, at *28–29. They are the most intimate details of children's lives:

> The records sought here fall at the highest end of the intimate and personal spectrum. They contain comprehensive psychosocial evaluations and deeply personal disclosures by children about their bodies, sexuality, trauma, family dynamics, self-harm, mental-health history, and cognitive and emotional functioning. They also include the diagnoses, clinical reasoning, and informed-consent discussions underlying treatment decisions. This level of detail places the information among the most personal and sensitive a medical provider can hold and squarely within the class of intimate material our Court of Appeals has long regarded as warranting the strongest constitutional protection.

*Id.* at *26.

That anonymity cannot be an absolute salve in every circumstance is common sense: "Imagine if nude pictures of a woman, uploaded to the Internet without her consent though

without identifying her by name, were downloaded in a foreign country by people who will never meet her. She would still feel that her privacy had been invaded." *Ashcroft*, 362 F.3d at 929. The same logic applies here, where, "[e]ven if there were no possibility that a patient's identity might be learned from a redacted medical record, there would be an invasion of privacy," because the records contain the most intimate details of the child's life. *Id.*; *see also Lora v. Bd. of Ed. of City of New York*, 74 F.R.D. 565, 582 (E.D.N.Y. 1977) ("Anonymity, while undoubtedly reducing the degree of invasion of privacy attendant upon dissemination, does not necessarily, then, reduce that invasion to zero.").

The Kansas Supreme Court's decision in *Alpha Medical Clinic v. Anderson*, 128 P.3d 364 (Kan. 2006), is instructive. There, the Kansas Attorney General subpoenaed unredacted medical files, which contained "many details of each patient's sexual and contraceptive history" irrelevant to the criminal statutes at issue. *Id.* at 378. Even after the Attorney General conceded that the patients' information could be redacted, and while applying the *Westinghouse* framework, *id.* at 377-78, the court prevented disclosure of any "information unrelated to the legitimate purposes of the inquisition," *id.* at 379. Next, recognizing the possibility that the criminal statutes were being used to settle political debates, it required the trial court to "determine whether any of the files demonstrate nothing more than the existence of a reasonable medical debate" that "would not constitute a crime," and expunge those files from production altogether. *Id.*

The privacy interests inherent in medical records are only "amplified when the records are of a procedure that" the government "declared to be a crime," *Ashcroft*, 362 F.3d at 929 (denying production of redacted medical records of abortions pursuant to a subpoena in part because redaction would be insufficient to protect patients' heightened privacy interests), let

13

alone the records of *children* that the government has declared to be subject to "barbaric practices that maim and sterilize" them, *UPMC*, 2025 WL 3724705, at *2 (cleaned up); *see also CHOP*, 2025 WL 3252648, at *30 (noting that "we are in a different posture" from the normal case where "protective orders, sealing, and similar mechanisms can further mitigate risks of disclosure[.]"). These privacy interests are even more crucial when the animus towards those targeted by this sort of inquisition "has at times erupted into violence." *Ashcroft*, 362 F.3d at 929; *see also Doe v. Triangle Doughnuts, LLC*, No. 19-CV-5275, 2020 WL 3425150, at *4 (E.D. Pa. June 23, 2020) (recognizing "widespread discrimination, harassment, and violence faced by [transgender] individuals").

In short, Patients have demonstrated "a detailed and unrebutted showing of the harm and consequences to follow even from the slightest disclosure of a child's sensitive medical records." *CHOP*, 2025 WL 3252648 at *27. Those "disclosures would strip patients of control over their most personal information, expose intimate details about their bodies and lives, and risk public outing and lasting stigma. The disclosures would inflict deep emotional harm, destroy trust in medical care, and spread the damage to families, peers, and many others." *Id.* at *27. That harm will remain, even if the records could be anonymized (which they cannot). And that "harm is grave, foreseeable, and—by the Department of Justice's own admission—imminent." *Id.* at *27.

### C.    DOJ has already failed to make even a threshold showing that it needs these records

Patients need not relitigate each *Westinghouse* factor, because as this Court explained, *Westinghouse* requires a threshold showing on the other side of the ledger: that the government "has *any* legitimate need for the information sought—*and* that it *likewise* requires longitudinal data." *UPMC*, 2025 WL 3724705, at *3. The government already failed to clear the bar: "*Nothing in the present record establishes a need*—within the meaning of *Westinghouse* or

Congress's grant in Section 3486—for the patient-identifying clinical files demanded in Requests 11–13." *CHOP*, 2025 WL 3252648, at *31–32 (emphasis added).

This broad failure also makes plain why a protective order requiring an individualized inquisition into requests 11 through 13 (as opposed to the requests the Court did not rule upon) is not a bridge this Court need cross. Courts instituting those sorts of document-by-document orders do so when they need to balance an individualized intrusion against a specific government need for those documents. *See Westinghouse*, 638 F.2d at 582 (remanding to the district court to create the opportunity for a case-by-case objection to "balance the competing interests before ordering disclosure of the material"); *Alpha Medical Clinic*, 128 P.3d at 379 (creating a protective order that still required an individualized showing that the invasion was related to "legitimate purposes of the inquisition"). Here, with no legitimate purpose, *CHOP*, 2025 WL 3252648, at *31–32, the Court need not go down that path. The government has *no* interest in the records against which to balance Patients' overwhelming privacy interest. The scale tips over in Patients' favor.

The modesty of Patients' request makes this plainer. While four courts have quashed the subpoena in its entirety, from personnel records to communications with marketing departments, *see, e.g., Boston Children's*, 800 F. Supp. 3d at 239, Patients ask only that their personal and health information is shielded from a government that has deemed their healthcare decisions akin to demonstrations of societal "evil," PBS NewsHour, *Trump administration seeks to cut off access to transgender health care for U.S. children*, at 36:52 (YouTube, Dec.18, 2025), https://www.youtube.com/watch?v=_TQeKC87geU. This means that, whatever its improper purpose, DOJ may still pursue its alleged "investigation into federal health care offenses without forcing disclosure of these records, particularly given the breadth of other information the

15

Hospital already agreed to produce." *CHOP,* 2025 WL 3252648 at *24. In other words, DOJ will not gain access to specific sets of records that six different courts, including this one, have determined it does not need and to which it is not entitled. This Court remains correct.

Every court to consider this issue started with a foundational question regarding the connection between the violations DOJ has authority to investigate and the documents it was demanding. Nothing about DOJ's vague concession has changed the answer: "[T]he Department of Justice today has not shown the specific need to investigate the children." *Id.* at *23. The balancing therefore remains "overwhelmingly" in favor of quashing requests 11 through 13. *Id.* at *8.

## CONCLUSION

The Court's decision was correct, and its decision should stand as to requests 11 through 13. The remainder of the privacy invasions in the subpoena related to requests 1 through 10, 14, and 15 can likely be resolved through traditional redaction procedures.

Dated: January 16, 2026

BALLARD SPAHR LLP

Michael P. Robotti* (NY 4718532)
1675 Broadway, 19th Floor
New York, NY 10019
212-223-0200
robottim@ballardspahr.com

J. Chesley Burruss* (PA 331521)
Kevin M. Hayne* (NY 5967526)
Elizabeth A. Lilly* (PA 336185)
1735 Market Street, 51st Floor
Philadelphia, PA 19103
burrussc@ballardspahr.com
haynek@ballardspahr.com
lillye@ballarspahr.com

FLANNERY GEORGALIS

Colin J. Callahan (PA 328033)
436 Seventh Avenue
Koppers Building, Ste. 2100
Pittsburgh, PA 15219
412-213-4246
ccallahan@flannerygeorgalis.com

Respectfully submitted,

*/s/ Daniel Urevick-Ackelsberg*
Mary M. McKenzie* (PA 47434)
Daniel Urevick-Ackelsberg* (PA 307758)
Meghan Binford* (PA 321212)
Olivia Mania* (PA 336161)
PUBLIC INTEREST LAW CENTER
2 Penn Center
1500 JFK Blvd., Suite 802
Philadelphia, PA 19102
267-546-1316
mmckenzie@pubintlaw.org
dackelsberg@pubintlaw.org
mbinford@pubintlaw.org
omania@pubintlaw.org

*Counsel for Movants*
*Pro hace vice*

17

## **CERTIFICATE OF SERVICE**

I, Daniel Urevick-Ackelsberg, hereby certify that on the 16th of January, 2026, I caused the foregoing document to be filed electronically with this Court, where it is available for viewing and downloading from the Court's ECF system by the Court and all parties.

*/s/ Daniel Urevick-Ackelsberg*
Daniel Urevick-Ackelsberg